Our next case of the afternoon is in re the Marriage of Wilkerson, 410-0396 for the appellate, Ms. Wyman. And I believe Ms. Benjamin, you may proceed. May it please the court, counsel. Supreme Court Rule 901D requires that a decision in a custody case be made no later than 60 days after the completion of a trial or hearing on the matter. Despite that requirement, which went into effect prior to the commencement of these proceedings, Associate Judge Brian McPheeters waited 586 days, more than 19 months, before making a decision on the permanent custody of what had been, on the last day, the third day of permanent custody proceedings, a two-and-a-half-year-old child. This, on top of the fact that the evidence the court heard included virtually no information on the factors required to be considered under 602, with regard to the interaction and interrelationship of the child with persons who may significantly affect the child. Well, who's in charge of promulgating the evidence? Who's in charge of promulgating? It's the parties. What happened, as the court is probably aware, is there were three dates for permanent custody hearings. In the middle of those hearings, in July, two hearings in July, and then September 19th, the respondent, Greg, the father of the child, moved from Champaign, Illinois, down to Carbondale, Illinois. The court looks at the evidence that was properly admitted, and then the court's ruling in the separate appendix, starting at page 818, you'll notice that there are about two sentences about the child's factors, 602 factors, about the child in Carbondale. On page 2 of the court's ruling, middle of… My point, counsel, is that generally in our system, the lawyers are in charge of promulgating the evidence, not the trial court. That's true. So you're complaining that insufficient evidence was promulgated. That's only part of my argument. The other part is, as the court will see from the record, when the court failed to make any ruling within 60 days of the close of evidence, and in fact, within nearly a year after proofs had closed, on July 30th, 2009, Catherine filed a motion to reopen proofs, asking that the court hear evidence on what had happened not prior to September 19th, 2008, when proofs closed, but to be able to present evidence about what's happened with the minor child in the last nearly year since the court, since proofs closed. The court denied that. Was there a proffer of what evidence that might be attached? It was a verified motion to reopen proofs. Essentially, I think that can be considered a proffer because it was verified, it was allegations and facts set forth by the respondent, by Catherine, as to issues that the court can and should consider that relate to the best interests of the child. The court refused to, the court, after Greg's attorney in the trial court filed a motion to strike, or motion to dismiss, there was a hearing on that, and the court granted, on October 20th, the motion to dismiss, Greg's motion to dismiss, and denied the motion to reopen proofs, that verified motion. There was never an answer or a verified response filed by Greg to the July 30th, 2009, motion to reopen proofs. Still, without any response, or without any ruling by the court, even after 412 days had passed on October 20th, when the court heard only legal arguments, and denied the motion to reconsider. Catherine then, on November 5th, 2009, filed the motion to reconsider. That was 420 days after proofs had closed. The court, Catherine then asked for, and filed a motion to schedule an evidentiary hearing on the motion to reconsider, suggesting that if there were issues, if, for example, Greg did not object, and did not deny some of the allegations on the motion to reconsider, it would allow the court to then be able to determine whether there was, whether the issue should be reopened for proofs, again, only after September 19th, 2008, evidence of the child. And the court, on January 19th, now 487 days after the September 19th, 2008, close of proofs, denied the motion to reconsider, and denied Catherine's motion for an evidentiary hearing. It wasn't until 586 days after proofs had closed, of course, much longer than the 60 days required by Supreme Court Rule 901D, that the court finally made a determination on permanent custody of the minor child. Now, keep in mind, we have a decision about a now four-year-old child, as of April 28th, 2010, four and several months, based on evidence about the child when he was only two and a half years old. Despite that fact, if Catherine wants to try to modify custody two years from April 28th, she has to show and demonstrate a substantial change in circumstances, not from the evidence that the court heard back in September of 2008, but from the court's ruling, from the date of the court's ruling in April 2010. Despite the fact that the court refused to hear any evidence, and refused to consider any facts about the best interest of the child as he was living in Carbondale. We have virtually no evidence about the child's relationship with his babysitters down in Carbondale, although, as the court notes, Greg has a babysitter three nights a week for the child. We know nothing about who or how many babysitters there are, how much time they spend with the child, how that relationship is going. We know nothing about the child's relationship in daycare with any daycare friends, if there are any playgroups, if there are any activities at all. And so the factors that the associate judge was required to consider under 602 could not have been considered because the court refused to hear any evidence, despite Catherine's repeated requests to reopen proofs to provide evidence and allow evidence to be heard on the 602 factors for, and since the child moved to Carbondale, and since the proofs had closed on September 19, 2008. We have no information, and the court had no information on which to base its permanent custody decision as to factor three, the interaction and interrelationship of the child with parents, siblings, and other persons who may significantly affect the child's best interest in Carbondale. Except we have the history of Greg's relationship with the child back in Champaign. We have the history, and then we have the information and testimony regarding Catherine's relationship with the child, her children, three children from prior marriage, those children's relationship with Marcus, and we have the information about Laramie, Wyoming, where Catherine has lived the entire time. But we have nothing about this new city of Carbondale and the child's interactions and interrelationships with anyone down there, including the babysitters or the daycare providers or anyone else down there. We have, as to factor eight, which is the willingness and ability of each parent to facilitate and encourage a close and continuing relationship with the other parent and the child. We have no information from Greg about how that has changed or how that is in Carbondale, because again the court refused to allow that information. We do have the verified pleadings filed by Catherine subsequent to September 19, 2008 with regard to Greg's behavior since September 19, 2008, his interference with that relationship, his refusal to allow Catherine and the children to have this visitation with Greg. And then we have the history that Greg testified to and admitted to, that Catherine testified to, and that the limited guardian ad litem, Roger Marsh, testified to, is to Greg using an egg timer or some similar timer as to the phone and video time that Catherine and her children could spend with Marcus. We have the evidence, unrebutted, that while Greg would allow his mother to have more than one telephone conference or telephone call a day with a minor child, Greg limited Catherine to only one telephone call a day. And again, in those conversations, those were strictly limited by the egg timer. So we do have those admissions as to his past behavior. We have no answers to the verified pleadings with regard to Greg's behavior after September 19, 2008. And it was, I believe, an abuse of discretion for the court to refuse to allow any new evidence, any new evidence you're hearing as to the best interest of the child post-September 19, 2008 when the court failed to comply, not just by a little bit, but by more than 17 months, failed to comply with Supreme Court Rule 901D. Now, this might not have been as much of a big deal if Greg had lived in Champaign and continued to live in Champaign because we heard some testimony from the sometimes daycare provider, Mila Chapman, the neighbor, Carol Sparks, who were in a whole new community, a whole new set of relationships, presumably, for the child with the daycare, with any activities. We don't know if there are playgroups. We don't know anything about any babysitters. I'm not sure if we even learned any names of any of the babysitters. But yet the associate judge made his determination on the best interest of the child based on evidence that occurred back in 2008, in the summer of 2008, in Champaign, without consideration, apparently. Certainly there's nothing in his ruling to suggest that he considered or even knew about anything that was going on in Carbondale. Again, there's statements by Judge McPheeters in his ruling about the child living in Greg's house in Carbondale with three bedrooms, and Marcus sleeps in one of those bedrooms. That's the extent of the information we know about the neighborhood in which Marcus lives. We don't know anything about the neighbors. Perhaps they hadn't even met any neighbors. We don't know anything about that neighborhood or those relationships. We know nothing about the babysitters, those people who apparently spend several evenings a week with Marcus. And we know nothing about the daycare in Carbondale except Greg's admission that he refused to provide and put down Catherine's name as the child's mother for the Carbondale daycare, refused to provide her name or phone number, any contact information as an emergency contact or anything if Greg were not able to be contacted. Essentially, what we do know is that the history in Champaign was an attempt, since Greg received temporary custody after neither Catherine nor her attorney showed up for the temporary custody hearings. Catherine was in Wyoming and hadn't been told by her attorney of the hearing, her previous attorney of the hearing, that Greg has attempted and done everything he could, as limited guardian ad litem Roger Marsh pointed out and lectured Greg about, to keep Catherine and her children away from Marcus and limit any time, while freely providing time with the neighbor in Champaign, Carol Sparks, with the babysitter, Bill Chapman, and with his mother, who is out in New York and would come and visit. There were no restrictions on any time for those non-family members. But when it came to Marcus' mother, there were restrictions after restrictions after restrictions. That we know about what happened in Champaign. And in Carbondale, the court had nothing on which to base its own decision on the best interest of the child because the court had virtually no evidence and refused and turned a blind eye to the attempts to provide and ask for an evidentiary hearing on factors and on evidence of the best interest of the child since September 19, 2008. It's as if the Supreme Court rules apparently don't matter in Champaign County, or at least when it comes to the best interest of the child, if a child's age can essentially double, while the court refuses to hear evidence on the child's best interest and instead turns to evidence and clearly a lot of inadmissible evidence from police reports for which there was no, that were admitted despite the objections, the hearsay objections and the uncorroborated police reports that the court allowed to be admitted into the record and which the court spent considerable time, I think virtually 10 pages of its decision, citing police reports that were uncorroborated and in fact denied by Catherine as well as a divorce decree that was not properly admitted and to which Catherine's name nor her attorney had signed onto or approved this to any form. We have essentially a limited guardian ad litem who admitted that he was leaning towards and wanting to grant custody of the minor child to Catherine after having interviewed Catherine, after having interviewed Greg and I believe contacting a few other people and looking over documents, testified that he was leaning towards Catherine and one week later changed his decision and why was that? He admits under testimony that the only reason he changed his recommendation was after having reviewed police reports provided by Greg's attorney without any knowledge by Catherine or Catherine's attorney that he was reviewing these reports and without any opportunity to then respond and say, wait a minute, here's the real evidence, here's what really happened. One of the reasons why this court and every other court in Illinois has said police reports are hearsay and cannot be relied on and are not evidence. Despite that fact, the limited guardian ad litem, not to be confused with the guardian ad litem who actually has to meet certain qualifications under the Supreme Court rules, but the limited guardian ad litem admits he relied solely on those police reports in changing his recommendation and the court then admits and states that it was appropriate for the limited guardian ad litem to rely on those police reports, despite them being hearsay, and relies on those in making a determination on custody, permanent custody, despite the fact that police reports were, that there was no testimony by anyone verifying the statements in the police report and despite the fact that these reports were forged. So what about the limited guardian ad litem testifying that he corroborated these reports as to, perhaps not as to the tenor of the police report, but that the incidents occurred by inquiring of the respondent? I think the testimony from Mr. Marsh was a bit, was confusing, but what the evidence showed is that Roger Marsh had met with Catherine back in October, October I believe of 2007, permanent custody hearings were summer of 2008, summer and fall of 2008. He talked and met with Catherine in the fall of 2007. He did not receive the police reports until January of 2008 and never spoke with her after having received those police reports. He talked with her, for example, and I don't have page citations I think readily available, but he talked with her about Marcus having been in the, having been left in the parking lot and how Catherine rushed back. They talked about that and in fact I think that was one of the big issues that Greg brought up. The important, what I think is significant is Greg never raised an issue there was about this until the divorce proceedings started. Greg never flew back to go see Catherine, to go take charge of the child or anything like that. And in fact I believe that the evidence is in here and the testimony is in here about when Catherine called Greg to tell him about this, Greg says, don't worry about it. My mom left me at a carnival when I was young too. Don't worry about it. The question was, did the limited guardian ad litem testify or represent that he had corroborated these events, that the events in the police report had in fact occurred and that at least part of that corroboration was from talking to the respondent. And I assume that if he did so testify he was talking about more than one of the incidents. There was testimony by the limited guardian ad litem that he had spoken with Catherine about these incidents. What is clear from then Catherine's response and then the cross-examination of the limited guardian ad litem is that, for example, this Tommy Jax incident. He asked Catherine, did you go to Tommy Jax, did you have some alcohol? The police report claims, and I think Greg's testimony from reviewing the police report claims that Catherine then spent time, or tried to drive her car. Catherine's testimony, and I don't think that's unrebutted, or I don't think it's rebutted, is that Catherine didn't try to drive in a car. She in fact called her friend who came to pick her up. Not because she was inebriated, but because she didn't even want to take any risks. So yes, there was some discussions about various events that were then in police reports, but the entirety of these police reports, for example, being inebriated and other allegations like that from those police reports, in fact, under cross-examination by Roger Marsh, demonstrate that they were not corroborated and those facts and those police reports should not have been admitted because he did not get verification from Catherine that in fact those incidents as relayed in those police reports actually occurred. And for those reasons, we would ask that the court remand the decision on custody regarding the minor child. Thank you. We'll hear from you in rebuttal. May it please the court, counsel. My name is Anna Benjamin and I represent the original petitioner and FLE in this matter, Mr. Gregory Wilkerson. This case is about the well-being and welfare of a young child four years old now. The single most important issue in this case is whether it is in the best interest of that child that he live and reside permanently with his father, Mr. Wilkerson. Ms. Trowbridge, Marcus Wilkerson's mother, has tried to make this case about every legal issue possible other than what is really in Marcus's best interest. All of her arguments, however, cannot change the facts and cannot change the facts of her troubling history regarding her failure to supervise not only her children from a prior marriage, but also the minor child in this case, Marcus. Additionally, I think jurisdiction was one of the issues raised in the briefs. It has not really been discussed here at oral argument, but I think jurisdiction is easy in this case. Illinois has jurisdiction because Illinois is the home state of Marcus. It was at the time that this initial custody dispute began. Additionally, the trial court properly considered the limited guardian ad litem's report and recommendation and the limited guardian ad litem properly reviewed police reports and investigated facts outside the record to be the eyes and ears of the trial court to help the trial court arrive at an appropriate permanent custody decision. Furthermore, Ms. Trowbridge's efforts to extend this litigation further than it has already been extended by filing a motion to reopen proofs and a motion to reconsider that motion to reopen proofs, those were also properly denied and dismissed by the trial court. Finally, the trial court's evidentiary rulings regarding the use of police reports during testimony, the request to admit facts, and all of these other evidentiary issues, those rulings by the trial court should also be affirmed by this court. As I said, the single most important issue in this case is whether it is in Marcus' best interest to reside permanently with his father, Mr. Wilkerson. Due to Ms. Trowbridge's troubling history of her failure to supervise her children, the trial court did not abuse its discretion in awarding permanent custody to Mr. Wilkerson. The facts of Ms. Trowbridge's history with her kids from a prior marriage and with Marcus are troubling, but they are simple. The truth is that Ms. Trowbridge left her infant daughter in a bathtub and left her daughter alone and went to chase after a family dog, and when she returned, her daughter had drowned. Additionally, in another incident, Ms. Trowbridge left her children unattended in a vehicle, an SUV. One of her children climbed the seats, put the SUV into gear, and it ran into a nearby mobile home. On a third incident, Ms. Trowbridge… On that incident, what, if anything, did the respondent say about it or provide to the guardian ad litem by way of written materials? Your Honor, we know that Ms. Trowbridge provided 108 pages of narrative and materials to the limited guardian ad litem. I'm asking, what, if anything, did she say about that incident, either in testimony or in those materials? Your Honor, I don't believe she denies that that incident occurred in her own testimony. What does she say about it? Not whether she denies that it occurred, but does she acknowledge the existence of that event having occurred? Yes, Your Honor. Her explanation was she left the kids in the car. She was about to rent a home across the street or something. She got out of the car and went across the street to talk to the landlord, and that was her explanation for why she had left the kids in the car. She may have also said something about the fact that it was cold, and so she had left the car on. So that happened. In a third incident, she again left her children in the car, and I think her explanation was that she was unloading or loading toys into that SUV. And again, her son, who was maybe four years old at the time, climbed into the front seat, put the car into gear. This time, one of the car doors was open. That car door hit Ms. Trowbridge's other daughter, Autumn. Daughter Autumn fell to the ground, and the SUV ran over her. Even looking at the events that have occurred in this case with respect to this child, Marcus, it's troubling. And the record provides solid information, solid foundation for the trial court's decision. First, we have the incident where Ms. Trowbridge, in 2006 in Wyoming, left Marcus when he was two months old in a parking lot unattended. Her explanation was that her mother had come to that parking lot. She saw her. They were talking. She got distracted. And after she finished loading her items into her car, she got in the car and left. She drove all the way home, and only then realized that she had left her two-month-old baby in this parking lot. There were also additional events where Ms. Trowbridge, the police intervened. And what we know, what Ms. Trowbridge has admitted, is that she was drinking. Now, she wouldn't admit that she was intoxicated. She was drinking, and she had Marcus with her. The police intervened because someone thought she was going to be driving away with this child. And then there was another incident. And Mr. Wilkerson testified that he had been visiting in Wyoming again back in 2006. Ms. Trowbridge came home after a night she had been drinking. She had Marcus with her. And she refused to come inside the house. They had an argument, and she said, I'm not coming in. Marcus and I are sleeping in the car. And this was in the dead of winter. So these events, again, provide ample evidence for the trial court's decision. Mr. Wilkerson, on the other hand, has provided a safe and stable environment for Marcus. He surrounded Marcus with daycare providers and other individuals who nurture and care for him. Even before Mr. Wilkerson and Ms. Trowbridge split, Mr. Wilkerson was actively involved in Marcus' life. He changed diapers, got up in the middle of the night, went to doctor's appointments with Marcus. He also was the one who got up with Marcus in the morning, got Marcus dressed and ready for the day, and had breakfast with him every morning. This is an active father. As this court well understands, it's important to remember that the standard of review here is abuse of discretion. As this court stated in In Remarriage of Spent, a custody determination inevitably rests on the capabilities, temperaments, and the party's personalities, and the witness's demeanors. And the trial court is in a far better position to observe those temperaments and demeanor and to assess the credibility of all individuals involved. In this case, the trial court heard three days of evidence and testimony regarding the best interests of the minor child. Ms. Trowbridge has alleged error and filed a motion to reopen proofs and a motion to reconsider based on the fact, and these were filed before the trial court's decision, based on the fact that time passed between the testimony that was heard and the trial court's opinion. And the truth of the matter is, in order to succeed on that motion to reopen proofs, she had to prove several things. And two of those important things that she had to prove were that she, whether the failure to introduce evidence occurred because of an invertence or calculated risk, but the most important is whether the evidence is of the utmost importance to the case or could have changed the result in the case. And if you look at the motion to reopen proofs, there's nothing in there that would change the result. It's more of the same. And it's more allegations that Mr. Wilkerson didn't provide enough phone visitation or phone calls, didn't provide enough video conferencing, and that Mr. Wilkerson wouldn't agree to four weeks of summer vacation but would only agree to three weeks. And most of these items were already elicited at trial and were already in Ms. Trowbridge's closing arguments. So they weren't of the utmost importance. They were cumulative. And that's one of the standards under whether a motion to reopen proofs should be allowed, is whether the information is cumulative and, as I said, whether it is of the utmost importance to the case. As I see it, only one of the best interest factors is really come into play by those allegations, and that's the willingness of Mr. Wilkerson to foster a positive relationship between Marcus and Ms. Trowbridge. And that's the only factor that really comes up. And, again, the information is cumulative. The trial court already heard it, and that's why the motion to reopen proofs was properly dismissed. And the subsequent motion to reconsider the motion to reopen proofs was also properly denied. Returning to the issue of the guardian ad litem, there's been an allegation that the guardian ad litem shouldn't have reviewed any information outside the record and that the trial court committed error by listening to the limited guardian ad litem's report and recommendation that was based on those events outside the record. I think the Illinois Marriage and Dissolution of Marriage Act allows the trial court to utilize professional personnel in custody cases. Again, these guardian ad litems or other personnel employed by the court are to be the court's eyes and ears because the issue of custody is so important and the issue of the child and their best interest is so important. According to the Illinois Marriage and Dissolution of Marriage Act, the investigator whom the court employs can contact or consult any individual who may have information relative to the child's potential custodial arrangement. In Section 605, the statute gives that investigator permission to consult and obtain information from medical personnel, psychiatric personnel, or other expert persons who have served the child in the past, and that's without obtaining the parent's consent. And the parties have the ability to investigate or cross-examine that investigator and elicit whether there was bias or whether there was error by the investigator. In this case, the investigator, the limited guardian ad litem, did testify and Ms. Trowbridge had the opportunity to cross-examine him and ask him about any potential bias. If there were errors in the police reports or other information that the limited guardian ad litem had obtained, she had the opportunity to point it out, to ask him about it on the stand, to point out all of the inconsistencies in her closing arguments to the court. And as far as I could find, I didn't see anything like that. All of the events happened that caused the court and caused the limited guardian ad litem to recommend custody to Mr. Wilkerson. As far as jurisdiction is concerned, if this court is concerned at all about Ms. Trowbridge's arguments that the six-month period doesn't work or it doesn't matter or it doesn't meet the standard, it does. It doesn't matter what Ms. Trowbridge's intent was as far as her residency, her domicile has nothing to do with jurisdiction under the Uniform Child Custody and Jurisdiction Enforcement Act. But if there were some problem, there's another reason why Illinois has jurisdiction over this custody dispute. The only other court that could potentially exercise jurisdiction was Wyoming. And the Wyoming court declined to exercise jurisdiction. The Wyoming court said that Marcus did reside in Illinois for six months, more than six months, prior to the beginning of the custody dispute. And Illinois was the more appropriate for him for additional reasons. And those reasons were that, again, Marcus lived most of his life in Illinois, but also Mr. Wilkerson only resided in Illinois. And so all the evidence about Mr. Wilkerson's relationship to Marcus was in Illinois. And that therefore meets the standard under the act that one court that could potentially be the child's home state declined to exercise jurisdiction. The child and a parent have a significant contact or connection to Illinois. And there is substantial evidence in Illinois bearing on the custody decision. Again, I think it's important to remember that all of this, all of the allegations about whether this court should remand this case back for more evidence, fail to meet the standards because, again, nothing has been alleged that is of the utmost importance to the case. And Ms. Trowbridge really could have done more to exercise due diligence to uncover those facts before now and before she filed her motion to reopen proofs. It's true, Mr. Wilkerson moved during the pendency of the hearings, but Ms. Trowbridge could have brought that to the court's attention and asked for more time. She could have done something at that point in time to try to elicit more information or try to push the court's next hearing back to be able to get more information. And the court then would have had to decide whether that was appropriate and whether there was a significant enough change to warrant that. But again, most of the evidence is cumulative. It's all things that the trial court was hearing at the time and has now already heard, and that is that Ms. Trowbridge doesn't believe she gets enough telephone conversations, she doesn't get enough video conferences, she doesn't get enough extended visitation. But the evidence has showed that she does get all of that. She gets phone calls, she gets video conferences. Mr. Wilkerson works with her to arrange visitation. And none of these issues are of the utmost importance to the case because of the other facts that we can't change that bear on the issue of custody and bear on the best interests of Marcus Wilkerson. And again, those are Ms. Trowbridge's failure to supervise her children in the past, which resulted in their injury, and in one case, their death. These are serious issues. The counsel respondent argues in her reply brief that you failed to comply with Supreme Court Rule 341H6 and 341I by failing to cite the record. What's your response? Your Honor, yes, that's true. She argues that in her reply brief. She also filed a motion related to that, and she filed a motion to strike my brief, and I replied to that motion in detail. And I think the allegation was that I didn't provide citations to the record in my brief, and what I had done was provided a statement of facts, which, of course, appellees are not required to do, and I cited to the record throughout my eight- or nine-page statement of facts in my brief. Now, perhaps it's my fault that I drew an objection by not, again, citing every single time to the record when I referred to those arguments in my argument. But, Your Honor, I believe this case is too important to be cited on that issue, and, again, I think I provided multiple, many citations in the statement of facts that should enable this Court to look at the facts and determine if what I've said in my brief is actually true. Your Honor, as I have said, this case is about the well-being of a four-year-old boy. The most important issue is whether it is in his best interest to live with his father, Mr. Wilkerson, and the trial court heard substantial evidence and did not abuse its discretion by awarding permanent custody to Mr. Wilkerson. If we look at the issues that Ms. Turbridge has tried to raise in her motion to reopen proofs and motion to reconsider versus the information that she tried to get out of the trial court, there's a big imbalance. She is trying to present information about babysitters and daycare providers and who Marcus is coming in contact with in Carbondale, Illinois. What she tried to really get out of the trial court were these incidences where her failure to supervise her children, like I said, led to their injury and, in one case, their death. This is a huge imbalance. The trial court heard the salient evidence, observed the witnesses and the parties and their credibility and demeanor, and did not abuse its discretion by awarding permanent custody to Mr. Wilkerson. Thank you. Thank you, counsel. Ms. Butler? If I could reply briefly to Ms. Benjamin, some of Ms. Benjamin's statements, and then also answer questions that Justice Connick had with regard to the limited guardian aid items statements and whether he had corroborated information. I do agree with Ms. Benjamin that this case is about the best interest of the child. But the fact is, and Ms. Benjamin still hasn't responded, to the fact that the trial court had no evidence, virtually no evidence,  but what you're missing when you focus on that and the court's inexcusable delay in ruling, you've got that in your favor. And it puts you at a procedural disadvantage in trying to introduce some new evidence. But he considered what the tone and tenor of that new evidence would be and essentially said it could not be dispositive. Because while he didn't say it quite this way, I made this decision on the basis of the fact that I don't think this child would be safe with your client. And whether or not Mr. Wilkerson is an ideal parent and whether or not he facilitates communication and visitation in the best way that he could is not going to outweigh what the trial court has already determined. I think you're right that the trial court, I'll agree with you, that the trial court is saying it doesn't matter what's going on. Essentially, I don't have information on Carbondale, but I have information about your client Catherine's history from 14 years ago, way back, with her children who she has joint custody of from a time before she even met Greg Wilkerson. And the court considers that quote-unquote evidence, despite the fact that that information and those allegations come from police reports. And as I discussed starting in the reply brief at page 12 with regard to Mr. Marsh's testimony, from between the time he received those police reports on January 15, 2008, to one week later, when he changed his recommendation from Catherine to Greg, he had no further telephonic or in-person conferences. What was in the 108 pages that your client gave to the guardian? Those 108 pages include discussions about her relationship with Marcus, Marcus's relationship with his siblings, who she has joint custody of. It's actually Marcus's step-siblings. And there's discussion about how, because Marcus is half-black and half-white, how she raised her children to consider and talk about Marcus as their sibling so that they don't see this racial dividing line. There's discussions in those 108 pages, and I believe in her testimony, about... Well, are they her children? Yeah, they're her... sorry. Well, then they're not step-children. Sorry. They share a biological mother. I'm sorry. Yes, I misspoke. They share a biological mother and have simply a different father. And there's discussions about those relationships with the children. I didn't have an opportunity to discuss the jurisdictional issues, and what I would like to mention is all of these factors that Greg points to, this evidence or so-called evidence of police reports and things that happened back in Wyoming, could have been discussed, could have actually been properly admitted into evidence, and police officers called had the jurisdiction been in Wyoming, where it should probably have been. This is where the petition for dissolution was first filed in the state of Wyoming. Marcus had returned home to Wyoming where Catherine was living and simply had visited Greg in Illinois. But Marcus had returned home during their visit, I think in the fall, in August of 2008. And the factors point to Wyoming being the proper place where all of that evidence and information can be. Greg had actually filed in one of his affidavits that he intended to return to the Rocky Mountain area as his permanent residence, being Wyoming or being in that Rocky Mountain area. Even though this is a family law case and under the Marriage and Dissolution of Marriage Act, the laws of evidence and the rules of evidence should still be done. And this Court should be concerned, and I hope this Court remains concerned, that the Associate Judge did not have evidence to rely on. Why are you referring to him as the Associate Judge? Is that an indication that he is of lesser ability or experience than the other judges in Champaign County? Your Honor, there are two judges in Champaign County who deal with family law, Judge Arnold Blachman and Judge Brian McPheeters. And Judge Blachman has been on the bench since 1996, I believe, and does have, I think, a lot more experience on the issues of custody decisions and the family law issues. I think he's dealt with those issues a lot longer. Judge McPheeters was in traffic court for a while, and I think at the time he took over this case, had just recently gone on to the family law bench to assist Judge Blachman with that caseload. We would ask that the Court either remand this case for further evidence subsequent to September 19, 2008, that this Court reverse the decision or that the Court vacate the decision and return this case to the State of Wyoming. Thank you, Justice. I take the matter under advice.